Mr. Titus, do you have a group here that you want to introduce to the court? I do, ma'am. Please record that. I'm pleased to introduce the eighth-grade students from Holy Rosary School in Pittsburgh. That's a school for those judges who are not from Pittsburgh. It's in the center of the city. The principal of the school was one of the young, new freshmen who are here today. They've been studying something about law this year. They actually tried a case before Judge Johnson in Common Pleas Court in December, a month prior. The judge reported that they had done better than most high school students. Okay. Well, Mr. Titus, who's an attorney here in town, we welcome you, and we also welcome the students from Holy Rosary School. We hope that the case you're about to hear is an interesting one, that you learn something from it. And with that, we'll call the case of Galatin Fuels v. West Chester Fire Insurance Company. Mr. Kozin. Thank you, Your Honor. Court, please, my name is Steve Kozin of Kozin O'Connor for West Chester Fire Insurance Company, and I would like to reserve three minutes for rebuttal. The request will be granted. Thank you, Your Honor. On the basis of three overriding axiomatic propositions, the result below should be reversed as a matter of law and judgment should be entered for West Chester. First, no insured under a property insurance policy or anyone claiming by, under, or through that insured is entitled to recover for a loss caused by a non-fortuitous event. Second, when a policy is canceled by the insured or by one to whom the insured has given the right to cancel, as opposed to a cancellation by the carrier, no notice is required under Pennsylvania law to a loss payee unless the policy or some other contractual relationship so provides. And then the terms of the policy for purposes of preserving coverage must be followed. Third, there was no clear and convincing evidence that West Chester either lacked a reasonable basis to deny liability and that it knew or recklessly disregarded the lack of such reasonable basis to deny. Moreover. Well, isn't that directly in the face of the jury finding? Well, it is, Your Honor, but I suggest that the jury was, that as a matter of law, that issue should never have gone to the jury, and I will address that, if you don't mind, in a moment. But I would make a note that neither the Unfair Insurance Practices Act nor the Unfair Claim Settlement Practices Regulations are relevant to proof of bad faith under the Pennsylvania Terlitzky test, and such claim practices have absolutely no nexus to the basis for denial in this case, which outlaws any attempt to go to punitive damages. Allow me, if you will, to go right to the fortuitous loss issue, because this case tracks Intermetal Mexicana, and its resolution properly moots entirely all other questions in this case. The Third Circuit test under Pennsylvania law for determining, as a matter of law, whether or not a first party property insurance loss is fortuitous and, therefore, compensable is that set forth first in Campagna de Bauxite and then in Intermetal Mexicana. And they both hold that they... What does that justify versus insurance claims? Well, I think, Your Honor, that that does not change the test, and I don't think, I think the test still remains the same under Intermetal Mexicana and... But here we have a lost case. But I don't think that the fact of a lost payee makes any difference. There are two kinds of lost payees, and I'll get to that, if you will, in a moment. One is a regular lost payee whose rights are derivative from the insured. They can never rise any higher than the insured. If there is no coverage for the insured, there is no coverage for the lost payee. And any act or default by the named insured voids the policy as to the lost payee. Then there's a standard lost payee or a lender lost payee. They have a separate and independent contract of insurance, but only, only if there is some act or default on the part of the insured. Fraud, arson, you know, fraud in the claim, so that the insured can't collect, but they can collect. However, however, even as to that lost payee, that simply gives them the status to make the claim. It doesn't give them coverage. It still has to be a covered loss. So when you ask yourself, what about the lost payee, assuming, for instance, that... In Giacometti, a building was burned down by the insured, and the insured burned it down, so they couldn't recover. But the others having interest in the building could. Now, here we have the equipment in the mine, and the mine is flooded, and the owner of the equipment is saying, we couldn't get in to get it out. Maybe the insured can't recover, but as a lost payee, it wasn't our fault that it was destroyed. We ought to recover. Totally different situation. I'm waiting for you to finish, Judge Roth. Chapping it a bit somewhat, because I'm familiar, as you know, with all these cases. But what you're talking about there in the insurance placement facility case is the typical arson and fraud case. What are the rights of a lender lost payee or a standard mortgagee who has a separate independent contract of insurance? Clearly, they can recover, not because the loss was not fortuitous as to them, but because they had no ability to meet the two tests in question, knowledge and control. They neither had knowledge of the certainty of the loss, nor did they have control over the result. So the default of the insured does not invalidate their right under a separate and independent contract to recover. So notwithstanding whatever their status may be, you still must ask yourself whether or not there is a covered loss here. We know, under the definitions that we have been given in Intermetal Mexicana and in Compania de Bauxite, that a fortuitous event is an event which, so far as the parties to the contract are concerned, is dependent upon chance.  It's not bound to occur, provided the fact is unknown to those parties. So what we have defined in Intermetal are the two elements. Knowledge of probable or inevitable loss, and right or ability to control the outcome, whether or not you exercise the right to control that outcome. For instance, in this case, consider... How are they going to control the outcome? Well, Your Honor... How could they control the outcome? The outcome in this case could have been controlled in a whole variety... And I'm talking only about the ability or the right to control. I'm not questioning their business decision. They made a business decision not to try to do it. I'm asking you how they could have controlled it. Well, they could have controlled it a whole number of ways, all of which are set forth in the testimony of Mr. Bernstein, if you'll recall. Well, what about the answer to Special Interrogatory No. 6? The answer to Special Interrogatory No. 4 and Special Interrogatory No. 6, I think, is exactly where, with all due respect, Judge Ambrose got it wrong. When you look at the issue of fortuity, and the question is whether or not they knew that the loss would occur, and they had the right or ability to control it, as set forth by Mr. Bernstein, all the different things they could have done, you don't ask whose fault is this. You don't ask the question, did Gallatin drive Mondew out of business, or was their business decision reasonable or unreasonable? That's not the focus of the inquiry, and that's not dispositive of the fortuity question ever. But No. 6 did defend and prove, by a preponderance of the evidence, that after plaintiffs became aware that the power to the line was to be set off for nonpayment of electrical service, plaintiffs made intentional business decisions not to exercise reasonably available contractual or legal rights that, if exercised, would have prevented the claim being lost. And the jury said no. No, that's exactly right. In other words, what Gallatin and the plaintiffs did or didn't do, okay, was not the sine qua non of the exercise of rights which would have prevented the loss. But that wasn't the inquiry. The inquiry is never whether or not it is reasonable or unreasonable, or whether or not it is a good or bad business decision, because if that were the inquiry, you would be turning a first-party insurance policy into a contract of financial guarantee insurance or into a performance bond, which this clearly is not. The only inquiry is, was there knowledge and was there the ability to control? You make the business decision not to exercise those rights. You make the business decision not to pay the electric bill, knowing that if the power is cut off, the mine floods and the underground equipment gets damaged. That's your right. You don't have to do that if you don't want to. You make the determination not to file a state court proceeding and get the sheriff to repossess the property, which you had a right to do under the lease, or repossess the property as you had a right to do under the mortgage, or file a petition for involuntary bankruptcy and go and get ancillary relief to enjoin the Allegheny Power Company from cutting off. Those are all abilities and rights that they had under their contracts. They chose not to do it, but the inquiry in Interrogatories 4 and 6 is exactly the improper inquiry under first-party insurance principles of what constitutes fortuitous loss, because it is not an issue of whether or not they exercised the right or made the business decision not to exercise the right. The inquiry is did they know the inevitable result and did they have the ability to control it? Had they chosen to do so? Clearly they did. Interrogatories 4 and 6 went to the issue of did they do it or should they be excused for having done it? That's not the correct issue. Mr. Cozen, you spent most of your time on this fortuity argument. Why don't you talk a little bit about the coverage issue? Well, the coverage issue is the fortuity issue. Well, the coverage issue, you made it the fortuity issue. Are you talking about the cancellation issue? The cancellation issue. No. The cancellation issue, it seems to me, the reason I went to fortuity is because if there is no fortuitous loss, which I think there clearly isn't as a matter of law, unless you want to rewrite Intermetal Mexico, it's very simple. The fact of the matter is that the district court erred in failing to find as a matter of law that Gallatin had no enforced policy at the time of this loss. Was Gallatin a standard loss payee or a regular loss payee? I don't see anything in the policy that describes him as anything other than a loss payee. I don't think they were a lender loss payee. I see nothing in the evidence that demonstrates that they were ever requested to be included as a lender loss payee. By the way, lender loss payee, with respect to property, non-real property, is the same as a standard mortgage equals. I see nothing in the record that shows that they were intended to be. Mr. Cozen, we're going to give you three more minutes, and we'll add the like amount of time to the other side. Thank you very much, Ron. But I find absolutely nothing in the Insurance Premium Company Act that says that UPAC, who was the lender to Monview for the premiums and had the right to cancel, didn't do it properly. Nor is there anything in that act or in the policy that requires that Westchester give notice to Gallatin when Monview or someone under Monview's rights cancels the policy. This is a strict policy cancellation by the insured or someone permitted to do so by the insured. Once that policy is canceled, as it was prior to any loss, whether the loss was April 8th, which to me is very questionable, Judge Ambrose decided it couldn't be any time prior to that, or whether it was subsequent when actual water inundation came into the mine, for our purposes it's irrelevant. The fact is cancellations took place March 29th. Based upon what UPAC did, they had a right to do it. This was a cancellation by the insured. When there's a cancellation by the insured, there is nothing in our standard statutory form under 40 pardons. There is nothing in any state regulation, and there is nothing in the Insurance Premium Finance Company Act, and nothing in this policy, which says that Westchester then has to notify a loss payee as Judge Ambrose held based upon the recommendation of Magistrate Mitchell. That's just dead wrong. Mr. Kozin, if we agreed with you that the policy was canceled. Yes. Could the bad faith award still stand? No. And why not? Well, Terlitzky sets it out, and Terlitzky makes it very, very clear. You have to have no reasonable basis for denying benefits under the policy, and you have to know that you didn't have any reasonable basis for denying benefits under the policy. Your client didn't know that the policy had been canceled until some six months after the proof of loss had been filed. I don't think that's accurate, Your Honor. Five months. Some period of time. I think there was some period of time where everything was being investigated and they came up with all of the facts. I think they knew that shortly after the loss was reported to them and the initial claim was made. They certainly knew it after the September claim was made. They didn't communicate it until the October letter. That may very well be the case, Your Honor, but that is irrelevant to the issue. But is it irrelevant to the issue of benefits? I think it absolutely is. If there is no coverage, if there is no valid and effective policy. There's no question there was a policy. No, that's not the question. The question is, a policy was issued. If the policy was canceled prior to the loss, then there's no valid and effective policy to respond to the loss. Consequently, you never have to even ask yourself the question, is it a covered loss? Because if there's no valid and effective policy, you don't know whether or not there's a covered loss. There's no right to even make a claim. That is the case here. And quite frankly, Westchester went and did something that was more than they had to do, which was after they took the position that the policy was canceled, they then said, nevertheless, under paragraph 2C1 of the policy, assuming that you're a lender loss payee, we will allow you to pay the premium and still make a claim. Okay, let me ask you another question. I wouldn't have given him that advice. Even though your time is up. The district court found that Gallatin had a right notification of the cancellation of the policy. I think that was our... Okay. Assuming, however, that was correct, did Gallatin have a right to know of the reduction in the amount of coverage under the policy? No, it's not a material change in the policy. Well, I mean, the coverage on their equipment went from 6 million down to 1.9 million. But the obligation of the insured Monview, the obligation of the insured Monview under paragraph 12 of the lease was to obtain insurance. The determination of what value to carry that. So they could have obtained $1 in insurance? But they had to give notice to Gallatin as to the policy and as to the coverage at the inception. Okay, and then they reduced it. They had the absolute right to reduce it as the insured. They had the absolute right to reduce that amount. But they had reduced it to $1? I think they could have reduced it to anything they wanted to reduce it to. And Gallatin might have a right against them for breach of contract. Well, a right against bankrupt Monview is... Well, bankrupt Monview was nothing, if you read this record, which I know your honors have done, was nothing more than a straw party. This was an attempt by Mr. Tasson to avoid the necessity of closing the mine down in 2000 while he would try to find a buyer because unless he continued to pay all the costs of maintaining the mine, it would have been worth it. We don't need to go into that. I agree we don't need to go into that, but your question prompted that response. I hope I've answered the question. Thank you, Mr. Coz. Thank you very much. I'm calling you back for rebuttal. You bet. Mr. Williams. Good morning. My name is John Williams. I'm here for Ecker Siemens and the cross-appellant Gallatin Fuels with respect to this appeal. Would the court indulge me and grant me 30 seconds of rebuttal time as a cross-appellant? That request will be granted. Thank you, Your Honor. Only 30 seconds, though. That's all I'm requesting. I intended to spend the first two or four minutes distilling down eight days of testimony into what I see as the salient facts. The court's questions suggest strongly to me that you're adequately familiar with the facts. I don't need to do that.  Why don't you tell us, Justice, because I'm interested in your position of why the policy wasn't canceled on or before April 8th. The policy was not canceled on or before April 8th for several reasons. One, Gallatin Fuels was a lender-loss payee. It was a lender's-loss payee because it had financing statements that had been filed with the court that were found by Westchester Fire before they even came to talk to us. They knew about that, and that's what the lender's-loss payee provision says, makes you a lender's-loss payee. That lender's-loss payee provision is a standard loss payee provision because it guarantees the lender's-loss payee rights that don't depend upon the named insured's rights. Where in the loss payee, loss payable provisions does it say that the notice of cancellation was due to Gallatin under this policy? The lender's-loss payee provision says this is in the appendix at page 2410. It's in the policy. If we cancel this policy, we give written notice to the loss payee at least 10 days before the effective date. Okay, but the question here, and I think the question comes down to  Did UPAC cancel the policy, or did Westchester cancel the policy? We know just like the question of fortuity that the state law is incorporated into the contract whether it's written there or not. That is upon the premise on which they hinge their fortuity argument. And the state law is overhauled. Pennsylvania Supreme Court said there are two policies here. The Superior Court in the three cases that I've cited in my brief, and I admit it's not the holding of the decision, but it's the rationale of the court. They get to their rationale by saying, among other things, that nothing the insured can do can reduce or cancel the policy as to a standard loss payee. That's the nature of being a standard loss payee without telling them. In fact, in the third case, Beaver Falls versus Alamania, they said even when the named insured and the insurer arbitrated the value of the property, it doesn't bind the standard loss payee. They have their own policy. But didn't the key holdings of those cases turn on the language of the loss payee provisions in the contract? No, sir. It goes to the nature of being the standard loss payee. But again, I understand that those aren't the holdings of those cases. It's merely the rationale. So I invite the court's attention to four out-of-state decisions that all hold that the policy cannot be reduced or canceled as to a standard loss payee. They're deemed to have their own policy, and it slides back to overhaul in that rationale. Okay, just let me clarify one thing, Mr. Williams. Yes, sir. You pointed to the language and I have the language in front of me. Would you agree if that language doesn't cover a cancellation like this? If we find that UPAC canceled this policy as opposed to Westchester canceling the policy, where do you get your notice rights from? UPAC, which we've been calling UPAC, canceled its own policy with Westchester. It doesn't have the power to cancel the policy, the separate policy, the distinct policy under overhaul between Westchester and a standard loss payee. So you're arguing that where there's a loss payee, there becomes a separate policy? Where there's a standard loss payee, I don't argue it. I invite the court to the overhaul decision where the Pennsylvania Supreme Court declared it. Okay. And I submit to you that the language of the endorsement endorses that view because the policy itself talks about when the insured cancels, when the insurer cancels, but the endorsement only talks about when the insurer cancels, and that's because only the insurer can cancel the policy with the standard loss payee. And so does that cover, then, the reduction in the amount of coverage? It also covers the reduction. The cases that I've cited to from out of state, well, actually, the three Pennsylvania Superior Courts from the 30s said in reaching their results, there's nothing the owner can do to cancel or reduce the coverage to a standard loss payee. Those were not the holdings of those decisions. Those are simply explaining how they got to the result there. It was the basis, though, in Beaver Falls for the Superior Court saying that the named insured and the insurer can't arbitrate amongst themselves the value of the property and put it to the standard loss payee. They're entitled to participate. They can't even agree to the value without, and this was after loss, without telling the standard loss payee. It's their policy. It's their equipment. Those are the principles we are asking the court to apply here, and I think the result is clear and obvious. Those were not the holdings that we can rely on here, and that's why we invite the court's attention to out-of-state decisions that apply that rationale and arrive at the holdings that we're asking the court to announce is Pennsylvania law here. It is, you know, you see an issue and you see it from so many different sides, and the court knows if this was a clear question, we wouldn't be here. I'd just cite a case and go home, but we're here to discuss what the law is, and there are so many clues as to what the law is. It can't be good faith to advocate a position that has no support at all, even in dicta, even in rationale of Superior Court or Supreme Court decisions of Pennsylvania. Instead, Westchester goes to a court in South Carolina which didn't recognize or even discuss the fact there's two separate policies, but is Pennsylvania law? In Zimmerman v. Harleysville, the Superior Court announced that in Pennsylvania it's not sufficient, it doesn't avoid bad faith by trying to pursue a line of reasoning that's unsupported in Pennsylvania law without regard to what you're doing to the insured and the consequences you're inflicting on them at the same time. I would invite the court to the citation I have for that case. That is 860 Atlantic 2nd 167. That's a 2004 Pennsylvania Superior Court case. The insurer is not at liberty to pursue every tenuous legal possibility at the expense of their insured. That's bad faith. How about fortuity? As I started out with, I believe the court's pretty familiar with the facts, but I would like to invite the court to focus in on the George Carter report. Mr. Carter reported that the power, $548,000 does not save this equipment. That every hour the power is off, you're going to have to run these pumps and the electricity for 12 hours just to get back where you were. And there's no reason to think that this water treatment facility, which is already approaching its limits, can do that. He thinks the best way to do it, if you were going to do it at all, would require a new water treatment plant. That would take another $150,000 and six months to erect. He estimates it would take $3 million to get that equipment out. But he testified, basically, if you have a lot of money and a lot of guts, it could be done, but a rational person probably would not undertake it. Would a rational person leave their equipment in a mine knowing that they were selling the mine to a buyer that had a somewhat shaky financial history? I think a reasonable person might. A reasonable person might ensure they have insurance for such an event. A reasonable person might be doing everything he can. He got guarantees from Mr. Hatch that he would show up on closing day with financial backing. We got representations from Mr. Hatch that the financial backing was coming very shortly. We continually pestered, hey, where's this money? It's coming, it's coming. I've got a group of doctors. They're going to be investing in me. We're going to finish all this interaction very shortly. Westchester espouses a view of fortuity that would preclude coverage if you went for a drive on a snowy day and flood off the road. Why? You knew the risks of driving in the snow. You know the road's icy. In fact, we have information that you were in a hurry. That does not make this case unfortuitous, or that case unfortuitous. The line they're trying to draw here today is so far from any of the cases on fortuity. Most of these cases, like University of Cincinnati, that they cite too often but discuss very little, the insured tore down a building and wanted to get that covered by the insurance. And the court said, that's not fortuitous. You can't, that's business planning. That's a decision you made. This is so far away from that. We had imperfect information. We're trying to get a hold of the power company who won't talk to us for a while because it's not our account. We're not an authorized representative. They tell us on April 5th, Friday afternoon, for the first time, that Lawn View is not just behind in their power, they're $458,000 behind, and we don't have the money. That's the sworn testimony at trial, and nothing was offered to contradict that. And yet Mr. Hart guaranteed $290,000. Under the premise he could switch the account to his own name and maintain it going forward, but he got a call the next day from the power company saying, you know what? Legal got involved. It appears to us that that's not your equipment, it's not your infrastructure, it's not your switching gear. No matter what you pay, we can't keep the power on for you. And Monday morning at 11 a.m., the power went off. Mr. Hart testified that he was told by Cragen Associates, and he believed it, that without Lawn View's cooperation, this was too risky and too dangerous. And in fact, Cragen Associates said, we don't want to be involved with it at all anymore. Meanwhile, Lawn View was telling the agent here, Ron Masseri, we will never allow a repossession to happen. We'll do what it takes. And that's where the equipment sits today. One week after the power was turned off, Cragen Associates reported, water was seeping into the mine at a million gallons a day. The floor was deteriorating from dampness. The ceiling was falling in. And that equipment is 19,000 feet into that mine. Mr. Hart made the decision not to make efforts to send people in there to get it. I don't find that unreasonable at all. And Wes Chesser attempts to rely on a report authored in September that said the equipment wasn't actually submerged until August. First of all, how does that help us? Second... How do we know? Pardon me? How do we know? Actually, George Carter's approach is brilliant in my mind. He sat down and said, if you've got a million gallons of water leaking into the mine every day, here's the mine floor. It took us weeks to get these maps. But here's how the structure of the mine... And you're going to be here after one day. You're going to be here after two days. You're going to be here after three days. Assuming the equipment was moved to high ground, in August it's going to be underwater. But he never testified that that's when it becomes unrecoverable. It becomes unrecoverable long before that, when toxic gases fill the mine. It's funny. Around the time of trial, there was a story of a local escaped convict who had harbored out in the mine, and he was there for half a morning and was taken away in an ambulance. That mine is dangerous from toxic fumes. The mine is dangerous. It fills with acidic gases when it's not being pumped out every day. And George Carter said this water... This pump was at 90% of its capacity when it ran perfectly and was tended regularly. Once you turn it off for a week, it's going to be 12 weeks just to get it back. But in the meantime, the roofs have fallen. In the meantime, the floor has deteriorated. Also on cancellation, Mr. Hart talked with the agent on April 3rd and was assured the policy was still in place. He talked with the broker on April 15th and was assured the policy was still in place, both before and days after the loss. For the purpose of establishing the existence of coverage they are, both as a matter of Pennsylvania law, and I discussed that in my brief, but also because that's the way this works. Everyone who testified said that's the chain of communication. The insurer doesn't want to hear from the insured. They're not given... The insurers are not given phone numbers or contacts. CRC, the broker, was told they're discouraged from giving out the contact information from the insurer. If the insurer wants to know something, they ask the broker, who asked the agent, who asked the insured, who reports it back to the agent, who reports it back to the broker, who reports it to the insurer. The insurer doesn't want to hear from the insured. So as a matter of practical course of conduct, that's how it works as well. Chief Judge Ambrose, who has no proclivity for overstatement, sat through eight days of evidence. She said at the end, there was an abundance of evidence presented at trial indicating that the defendant's conduct was intentionally dilatory. It was not the result of mere accident. She discusses some of those things. She said, these are but a few examples from the totality of evidence from which, in plaintiff's words, demonstrates that the defendant repeatedly put its interests higher than its insured, carefully, selectively crediting evidence that favored itself, wholly fabricating evidence where necessary to bully, to harass, to intimidate, to threaten, and to coerce Gallatin Fuels into dropping its claim. Westchester comes to this court today to say, hey, if I have an argument that I can stand up at a podium and make with a straight face, we're allowed to do that to our insureds. They're not. I've cited decisions in my brief that say they're not, that bad faith is more than having a basis to deny a claim. In addition to those cases, I would invite the court's attention to Northwestern Mutual Life Insurance versus Babigan. It's at 430 F3rd 121, an opinion issued by Judge Roth that recognizes that Pennsylvania bad faith goes beyond Terletzky. I also have collected a cadre of trial court decisions that I didn't locate in my initial briefing that I'd provide the citations to the court for the same proposition. It is very clear in Pennsylvania law, in my opinion, that bad faith is not out of the case as soon as they come up with a straight-faced argument. Do you agree if we find that the policy was canceled that there would be no bad faith? No, sir, for those reasons. In most of the cases, Terletzky is a perfect and classic example. The insured says, your reason for denying the claim is bad faith. And the insurance company says, no, it's not. Here's our basis for it. And it's fairly debatable. If it's fairly debatable, that's not bad faith, but that's not a license to do all the other things which are bad faith. It does not entitle the insurance company to lie about coverage. It does not entitle the insurance company to refuse to assist you on a proof of loss, and then accuse you of the crime of insurance fraud because you don't know what actual cash value means. Mr. Rebich explained to the claims adjuster, I don't know what actual cash value means. This equipment, being where it is, doing what it's doing generates a lot of money for Monview. What's the limit on the policy? And he was told $5 million. It generates far more than $5 million for the company, for Monview, so $5 million. He explained his basis. Now, I know that's not what the insurance company is looking for, but so does the adjuster. Yet the adjuster writes in his notes, I was asked for assistance by the insured. I refused to give it. And then later they turn around and claim this is fraud. And what's particularly beguiling about this is I deposed the adjuster. I deposed Chip Dickerson, who proclaimed himself to be the decision maker on this file. And I asked him, sir, do you believe that that was fraud? He said, I don't believe it. Do you know anybody on the planet that thinks that's fraud? He says, I don't know anyone. And yet they want to take it to the jury. Hopefully somebody on the jury will buy into this position that they themselves don't believe. I don't want to talk about fraud. I want to talk about fortuitous. Is this fortuitous? Does Giacometti, whatever that case cover it, is this because Gallatin couldn't get in to get the machinery out? Does that make it a fortuitous law? I salute the court's reliance on the case that you referenced. There's absolutely the question. It's not whether it's fortuitous in some abstract perspective. It's whether it's fortuitous from the shoes of the person making the claim here, Gallatin Fuels. What Monview did or didn't do has nothing to do with it. It's whether the standard loss payee could. And I'd submit to you that if you don't have $548,000 and the power company won't keep the power for you, no matter what you pay because it's not your equipment, it cannot even be a question to submit to anyone. I also want to observe this. We know, as Westchester Fire has argued, that this is a question of law for the court. We also know that the district court is entitled to submit to the jury any question of fact on which it would like to know what the jury thinks. We know that the district court here has submitted two questions to the jury and that the district court is free to come to any resolution of the legal question it wants to as long as it's consistent with those findings. We know that the district court is deemed to have found every other factual question favorably to the ultimate legal conclusion. And the question for this court is whether there's sufficient evidence on which to base such a finding. This court is not in a position, with all due respect, to revisit and re-weigh the evidence and resolve credibilities differently than the district court might have as your honors were not at trial and didn't hear the witnesses. The question is only where the evidence could support the findings necessary to the legal conclusion that this was as fortuitous as it gets. Mr. Williams, you reserve 30 seconds for cross-rebuttal. Do you want to talk for 30 seconds about your cross-appeal? I do. Thank you, Your Honor. Essentially, we raised two issues. I think the second one, I've said most of what I would say. And the way I structured the argument, that was whether the policy can be reduced in coverage as to a standard loss by E. On the mitigation instruction, by and large, I'd like to rely on my brief unless there's a question with this caveat. We are not asking for a new trial. Westchester Fire requested an improper instruction. They requested an instruction that did not ask the jury what might have been saved through mitigation. It opposed my efforts to get a proper instruction to work through with the court the proper measure of damages. They interrupted me and said, we think that it's more accurately stated the way it is, and the court had me move on. I also refused to submit that mitigation instruction as part of the joint instructions to the court. Having failed to obtain a finding from the jury, it's our contention that the affirmative defense is waived entirely, and we shouldn't be dragged through an entirely new trial so that it has another chance at bat on the whole case. And I would cite this case, for lack of a case that's right on point, and I know that this is by analogy, to Williams v. Thomas, 692 F. Second, 1092, that held that a defendant who has an affirmative defense that fails to seek a proper instruction to exercise that affirmative defense waives that affirmative defense. We are asking that the $600,000 that was taken away from the compensatory award simply be restored. We are not asking for a new trial on that. On the reduction question, we are asking for a new trial limited to the issue of the value of the equipment, not to exceed the applicable policy coverage limit, which was $6,494,000 that also had a $5 million total cap. Here the district court ruled that because the coverage had been reduced as to our equipment to $1,925,000, the jury was not permitted to arrive at a finding of value above that. That was over our objection. We wanted so we wouldn't have to have a retrial, at least a finding of the value, even if the court or the court had the jury reduce our compensatory award to the coverage limits. But Westchester opposed that and the district court wouldn't allow a finding as to the actual value. We'd like a new trial on that limited to the question of the actual value of the equipment as limited by the policy. Thank you, Mr. Williams. Thank you, Your Honor. Mr. Kosen. Thank you, Your Honor. I'm going to rely upon our briefs in the cross-appeal with respect to the issues that Mr. Williams has raised there because there's nothing new and astounding about them and I think it's adequately addressed. What I've just heard, while passionate and while a pretty good argument to a jury depending upon who's arguing against you, is nonetheless inconsistent with about 100 years of insurance law in the Commonwealth of Pennsylvania. Let me take them one by one. First of all, the whole issue raised by you, Judge Roth, with respect to fortuity. If Mr. Carter was right and Judge Ambrose, in effect, so found, not because of Mr. Carter but she found as a matter of law, that the loss actually took place on April 8, 2002. The moment that the power was cut off, the inevitable physical loss and damage was going to occur. So she made the determination, it's in her charge, it's in her opinion, that the loss occurred on April 8, the minute the power was turned off. Well, this was not something that was strange to Gallagher. They knew back in February that Monview was insolvent and wasn't paying its electric bill. He certainly knew, all the consequences and everybody who worked for him knew all the consequences. It wasn't like they just found out the day before and didn't have time to do something. They knew it in February. They knew it in March, the beginning of March, specific letters about the power going to have to be turned off. We haven't paid the bill since last year. They knew it on March 14th, another letter that's in the record. They knew it on March 18th. They knew it months and months and months before and they did nothing. Now, that's their decision. They didn't have to do anything, but they knew the inevitable and they had the ability and right to control the outcome. That is classic intermittent Mexicana. Number two, this idea that somehow there's a separate policy of insurance that comes about when you have a standard mortgagee clause or a lender's loss paying clause has got to be examined, not just broad-brushed. Read Overholt. Read the cases after Overholt and if you will, read Insuring Real Property. It's a three-volume treatise that has been accepted many times by the courts in which I have served as the editor, but there's a long line of cases and explanation that when you have a standard mortgagee clause or a lender loss payee clause, you establish not a new and different policy, but a separate contract of insurance which cannot be invalidated by some act or default of the insured, i.e., the insured sets fire to the place, you mortgagee can still recover. And when they talk about reduction in value, what they're talking about is you are insured for the amount of your mortgage debt. You are insured for the amount of your secured position, not that the insured itself has no right or ability without discussion with you to change from replacement cost to actual cash value, which essentially is exactly what happened in this case. Is there any evidence in the record here of what the actual value was, of what the secured value was? Yeah, I don't recall the evidence with respect to the secured value comes from the documentation. The evidence with respect to the actual value, it was put in by the discussion about why they reduced it because they didn't want to have to pay premiums on values that didn't take into consider the depreciated value of the, and we've cited to it in our briefs. So it certainly is in the record. Now, maybe the most astounding proposition is this broad brush idea that anybody I want to be somebody else's agent, if I just say it is, it's is. I'm familiar with the cases in which Judge Roth has written opinions on the issue of what is a broker and what is an agent and whose agent the broker is as opposed to whose agent the agent is. They talked to the brokers. The brokers were the insurance agent. They're not the agents of Westchester. And I don't disagree with regard to interrogatories four and six. If Judge Ambrose wanted those interrogatories to inform her of something that she thought was an appropriate factual element in the determination of fortuity, she had a right to do that. The problem is that those questions don't go to the issue of fortuity. Knowledge and control, not who was right, who was wrong, whether it was reasonable or unreasonable to make the business decision they made. And finally, I would, and certainly Judge Fischer, you look at the policy, you're right. Policy talks about if we cancel, meaning we, Westchester. We know what a notice of cancellation looks like from an insurance company on an insurance company form. That's not what this was. This was a cancellation by an insurer. It blows their whole argument out of the water. There was no valid and effective policy. And finally, let me simply say that the things that my friend has argued about in terms of describing the rather, in his view, dastardly conduct of Westchester I think is an overstatement. Not only an overstatement, but has no legal relevance to the issue of bad faith. If you look at Judge Stapleton's opinion in the dinner case, for instance, what you're talking, what he's talking about is, and you asked the question, if it was canceled, how could you have bad faith? No policy. Unfair insurance claims practices or unfair insurance practices act, those things don't go to bad faith. Bad faith is, what was the reason for the denial and did it have a reasonable basis? And did you know if it was unreasonable? Did you know it was unreasonable and nevertheless took it? All these claims practices had no place in the case, and particularly for punitive, they had no place in the case because they had no nexus to the basis for the denial. So, I don't think, Your Honors, that you get past the true issue of fortuitous loss here. Thank you, Mr. Krause. Thank you. May it please the Court, I'd like to exercise my 30 seconds of rebuttal. On your cross-appeal? Yes, sir. Okay. The purpose and effect of the Standard Clause is to protect mortgagees from the mortgager's derelictions with respect to the insurance policies on mortgage property and thereby to permit mortgagees peace of mind as to the subsistence of the insurance coverage on their collateral. That is cited to Standard Fire versus U.S. Fifth Circuit decision and supported by five or six cases they rely on. And to the extent that Westchester Fire argues that this was not a meaningful reduction in coverage, it leaves unexplained why they returned $94,000 in premiums for the reduction in coverage. Thank you. Thank you. We thank both counsel for excellent arguments and we'll take the matter under advisement. Thank you.